UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Mary Elizabeth Rose Traugh,<br><br>                                    Plaintiff,<br><br>v.<br><br>Carolyn W. Colvin, Acting Commissioner<br>of Social Security,<br><br>                                    Defendant. | Case No.:  15cv1611-DMS-BGS<br><br>**REPORT AND**<br>**RECOMMENDATION** |

## I.    PROCEDURAL BACKGROUND

Mary Elizabeth Rose Traugh ("Plaintiff") filed an application for disability insurance benefits on September 30, 2011, alleging disability commencing on January 14, 2010.  (ECF No. 14, Administrative Record "AR" at 165.)  Her claim was originally denied on April 3, 2012 (*id.* at 80) and upon reconsideration on November 21, 2012.  (*Id.* at 85.)  After a hearing on November 5, 2013, (*id.* at 34-54) Administrative Law Judge ("ALJ") Jay E. Levine issued a decision denying the application on February 7, 2014.  (*Id.* at 13-25.)

On May 30, 2015, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final agency decision.  (*Id.* at 1.)  This Court has jurisdiction pursuant to 42 U.S.C. §§ 405(g), 1383(c).  Plaintiff filed her Motion for

Summary Judgment on January 1, 2016.  (ECF No. 19)  In her motion for summary judgment, Plaintiff argues that the ALJ erred in finding her less than fully credible and in rejecting two opinions by the same treating physician.  (*Id.*)  Defendant filed her cross Motion for Summary Judgment on February 5, 2015.  (ECF No. 20.)  Neither party filed replies.

## II.   LEGAL STANDARD FOR DETERMINATION OF A DISABILITY

In order to qualify for disability benefits, an applicant must show that: (1) he or she suffers from a medically determinable physical or mental impairment that can be expected to result in death, or that has lasted or can be expected to last for a continuous period of not less than twelve months; and (2) the impairment renders the applicant incapable of performing the work that he or she previously performed or any other substantially gainful employment that exists in the national economy.  *See* 42 U.S.C. §§ 423(d)(1)(A), (2)(A).  An applicant must meet both requirements to be "disabled."  *Id.*  The applicant has the burden to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

The Secretary of the Social Security Administration set forth a five-step sequential evaluation process for determining whether a person has established his or her eligibility for disability benefits.  *See* 20 C.F.R. §§ 404.1520, 416.920.  The five steps in the process are as follows:

1. Is the claimant presently working in a substantially gainful activity?  If so, then the claimant is not disabled within the meaning of the Social Security Act.  If not, proceed to step two.  *See* 20 C.F.R. §§ 404.1520(b), 416.920(b).

2. Is the claimant's impairment severe?  If so, proceed to step three.  If not, then the claimant is not disabled.  *See* 20 C.F.R. §§ 404.1520C, 416.920C.

3. Does the impairment "meet or equal" one or more of the specific impairments described in 20 C.F.R. Pt. 404, Subpt. P, App. 1?  If so, then the claimant is disabled.  If not, proceed to step four.  *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).

4.  Is the claimant able to do any work that he or she has done in the past?  If so, then the claimant is not disabled.  If not, proceed to step five.  *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).

5.  Is the claimant able to do any other work?  If so, then the claimant is not disabled.  If not, then the claimant is disabled.  *See* 20 C.F.R. §§ 404.1520(f), 416.920(f).

*Bustamante v. Massanari*, 262 F.3d 949, 954 (9th Cir. 2001).

The claimant bears the burden of proof during steps one through four.  *Id.* at 953.  The Commissioner bears the burden of proof at step five of the process, where the Commissioner must show the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and work experience."  *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999); *see also* 20 C.F.R. § 404.1566 (describing "work which exists in the national economy").  If the Commissioner fails to meet this burden, then the claimant is disabled.  If, however, the Commissioner proves that the claimant is able to perform other work that exists in significant numbers in the national economy, then the claimant is not disabled.  *Bustamante*, 262 F.3d at 953-54.

### III.   MEDICAL RECORDS AND EVALUATIONS PRE-HEARING

The Court has synthesized Plaintiff's medical records for the purpose of providing context to its analysis of the issues.  This summary, however, does not purport to be exhaustive of every detail contained in the administrative record.

#### a.  Treatment Records from 2013

Plaintiff saw Juliet Schmitt, Marriage and Family Therapist ("MFT") at Psychiatric Centers at San Diego ("PCSD") on October 23, 2013.  (AR 548.)  Notes from that visit state that Plaintiff she is enjoying her volunteer time at the preschool, but is scared about someday having to find a job.  (*Id.*)

Plaintiff saw Michelle Kleiner, Nurse Practitioner ("NP") at PCSD on October 24, 2013.  (*Id.* at 510.)  During that visit, Plaintiff reported "doing better, but she still thinks

1   she could be doing even better." (*Id.*)  Ms. Kleiner further notes, "During the day she

2   does well probably because she has some structure, but by night she feels sad again

3   without any clear percipient.  She has been taking her other meds as prescribed for at

4   least the past four weeks.  Anxiety has been well managed." (*Id.*)

5        Plaintiff saw Juliet Schmitt, MFT at PCSD on October 12, 2013.  (AR 551.)  Notes

6   from that visit state that Plaintiff is "maintaining her shower schedule and taking her

7   medication daily." (*Id.*)  Plaintiff also reported that she started crying as she signed in to

8   her volunteer position.  (*Id.*)  The next day, she was "anxious about going to work, but

9   did push herself and luckily the needs and adoration of the little kids kept her focus off

10  her anxiety that day." (*Id.*)

11       Plaintiff saw Juliet Schmitt, MFT at PCSD on September 27, 2013.  (*Id.* at 554.)

12  During that visit Plaintiff reported that she was trying to work on a daily schedule, trying

13  to brush her teeth once per day and shower every other day.  She also mentioned going on

14  "OK, Cupid" to find a "good match." (*Id.*)

15       Plaintiff saw Michelle Kleiner, NP at PCSD on September 24, 2013.  (*Id.* at 514.)

16  Ms. Kleiner's notes from that visit state the following: Pt [Patient] states she is

17  responding positively to the Zoloft, and she is tolerating it well.  Patient is still depressed,

18  but she states she is a lot better and she would like to hold off before increasing the dose

19  further.  She reports taking meds regularly since she has moved. Patient has used Xanax a

20  few times, and it helps when she needs it.  (*Id.*)

21       Plaintiff saw Juliet Schmitt, MFT at PCSD on September 20, 2013.  (*Id.* at 556.)

22  During that visit Plaintiff reported starting her internship where she will be working three

23  days a week.  (*Id.*)

24       Plaintiff saw Juliet Schmitt, MFT at PCSD on July 30, 2013.  (*Id.* at 562.)  Plaintiff

25  reported that she did not take her medication for three days because she could not find

26  them and did not ask if anyone else knew where they were.  (*Id.*)

27       Plaintiff saw Juliet Schmitt, MFT at PCSD on July 19, 2013.  (*Id.* at 564.)  Notes

28  from that visit state that Plaintiff is crying about things easily, but her parents are

directing her to calm herself down.  (*Id.*)  She states she is continuing to take her medication daily.  (*Id.*)

Plaintiff saw Juliet Schmitt, MFT at PCSD on July 12, 2013.  (*Id.* at 566.)  Notes from that visit state that Plaintiff "continues to be more consistent with taking her medication (but stated that she forgot about taking her anti-anxiety medication and, therefore, her anxiety had been high this week." (*Id.*)

Plaintiff saw Juliet Schmitt, MFT at PCSD on July 5, 2013.  (*Id.* at 568.)  Notes from that visit state that Plaintiff reported that she took her medication consistently that week and was feeling better.  (*Id.*)  "She now has daily am and evening schedules which involve wake-up time, taking her meds and teeth brushing."  (*Id.*)

Plaintiff saw Michelle Kleiner, NP at PCSD on June 27, 2013.  (*Id.* at 518.)  Notes from that visit state: "Patient reports showering daily, working a bit for her mother, exercising, spending less time on her computer.  Patient states that she is feeling better doing these things for herself."  (*Id.*)

Plaintiff saw Juliet Schmitt, MFT at PCSD on June 21, 2013.  (*Id.* at 570.)  Plaintiff reported being "happy."  (*Id.*)  She admitted to taking meds daily for a week but now is back to every other day.  (*Id.*)

Plaintiff saw Michelle Kleiner, NP at PCSD on May 30, 2013.  (*Id.* at 522.)  Notes from that visit state that Plaintiff was not taking her medication as prescribed and that her mother stated she "has continued to be either very anxious or very depressed." (*Id.*)

Plaintiff saw Juliet Schmitt, MFT at PCSD on May 21, 2013.  (*Id.* at 574.)  Notes from that visit state that Plaintiff enjoys helping with the kids in the preschool, preparing supplies and teaching small lessons.  (*Id.*)  She said that she is not doing well remembering to take her meds but was not open to suggestions to help her remember.  (*Id.*)

Plaintiff saw Juliet Schmitt, MFT at PCSD on May 10, 2013.  (*Id.* at 577.)  Plaintiff reported that she is only compliant with her medication four days a week.  (*Id.*)  Ms. Schmitt reviewed ways to increase consistency with taking her medication, like

setting a reminder on her phone.  (*Id.*)

Plaintiff saw Juliet Schmitt, MFT at PCSD on March 23, 2013.  (*Id.* at 584.) Plaintiff reported that she was currently depressed and had low energy, despite taking her medication more regularly, i.e. only forgetting once a week.  (*Id.*)

Plaintiff saw Juliet Schmitt, MFT at PCSD on March 5, 2013.  (*Id.* at 588.) Plaintiff reported "doing a little better on remembering to take her meds daily (only missed 1 night in past week)."  (*Id.*)

Plaintiff saw Juliet Schmitt, MFT at PCSD on February 26, 2013.  (*Id.* at 590.) Plaintiff reported being depressed most days and that she has fatigue and low motivation. (*Id.*)  Plaintiff reported feeling lonely, even if she is with people.  (*Id.*)  Ms. Schmitt's notes also stated the following: "She [Plaintiff] does not think that her current depression has a precipitant or trigger, she thinks it is chemical (and she is still not able to be completely consistent with her meds.")  (*Id.*)

Plaintiff saw Juliet Schmitt, MFT at PCSD on February 12, 2013.  (*Id.* at 592.) Plaintiff reported that she is doing much better with medication consistency.  (*Id.*)  She was taking a shower and washing her face every three days and trying to brush her teeth every morning.  (*Id.*)

Plaintiff saw Michelle Kleiner, NP at PCSD on February 7, 2013.  (*Id.* at 526.) Notes from that visit state that Plaintiff's panic symptoms were still significant.  (*Id.*) Ms. Kleiner also states that Plaintiff stopped Abilify a few weeks ago to see what it would do.  (*Id.*)  Under the heading "Medication Compliance as Prescribed," Ms. Kleiner wrote "patient is compliant with medication as prescribed."  (*Id.*)

Plaintiff saw Juliet Schmitt, MFT at PCSD on January 28, 2013.  (*Id.* at 596.) Notes from that visit explain that Plaintiff is working on more consistency with her medications and her teeth brushing and face washing.  (*Id.*)  She had a mild panic attach due to "pent up nervousness anticipating the date.  She handled it well and it passed quickly."  (*Id.*)

Plaintiff saw Juliet Schmitt, MFT at PCSD on January 21, 2013.  (*Id.* at 598.)

During that visit, Plaintiff and Ms. Schmitt discussed how depression holds Plaintiff back "from daily self-care (teeth brushing, showers, shaving her legs, taking her meds, etc.)." Notes further state that Plaintiff "knows that if she took her meds consistently she would probably have an easier time doing things she needs to do, but depression holds her back from that as well." (*Id.*)

### b. Treatment Records from 2012

Plaintiff saw Juliet Schmitt, MFT at PCSD on December 10, 2012. (*Id.* at 604.) Notes from that visit state the following, in part: "She has spent most of her time on one class but not enough time on the other due to being easily overwhelmed, depressed and fatalistic . . . She is fearful of talking about the future and about having to get a job. When she thinks about it she starts to feel overwhelmed and wants to avoid it." (*Id.*)

Plaintiff saw Michelle Kleiner, NP at PCSD on December 4, 2012. (*Id.* at 532.) Ms. Kleiner's notes from that visit state: "Pt [Patient] has been taking meds regularly since 11/28/2012, and she wasn't prior because she was wallowing in her depression . . . Mother has also explored personality disorders, and she wonders if patient is borderline given her persistent difficulties with relating in the world which aren't just related to Asperger's. Discussed treatment options, but there aren't any DBT groups close by for teens/young adults." (*Id.* at 532.)

Plaintiff saw Michelle Kleiner, NP at PCSD on November 6, 2012. (*Id.* at 534.) Ms. Kleiner's notes from that visit state the following: "Pt [Patient] states she shut down and stopped meds regularly for a new weeks. She is now back on them regularly. Unable to evaluate increased Lexapro as a result." (*Id.*)

Plaintiff saw Michelle Kleiner, NP at PCSD on October 4, 2012. (*Id.* at 536.) Notes from that visit indicate that Plaintiff was taking her medications regularly. (*Id.*) Ms. Kleiner further notes that Plaintiff is "[d]oing a lot better but still feeling depressed . . . Anxiety is going down . . . Taking Adderall XR on school days which helps. Patient is taking 2 classes this semester." (AR 536.)

Plaintiff saw Juliet Schmitt, MFT at PCSD on September 22, 2012. (*Id.* at 609.)

She reported a depressed mood, fatigue, and body aches.  (*Id.*)  Notes from that visit state that Plaintiff is only taking her medication half of the time because she is forgetful.  (*Id.*)

Plaintiff saw Michelle Kleiner, NP at PCSD on August 14, 2012.  (*Id.* at 539.)  Ms. Kleiner's notes from that visit state that Plaintiff is having "broken" sleep, "waking up with a sense of anxiety 'like I forgot something.'  Mood more anxious now than depressed, not as tearful.  Pt [Patient] hasn't started Lexapro yet . . . Pt [Patient] states her current stressor is a work deadline . . . she states she shouldn't feel as anxious as she does."  (AR 539.)  Under the "treatment plan" Ms. Kleiner states "increase med. compliance."  (*Id.*)

Plaintiff saw Juliet Schmitt, MFT at PCSD on August 4, 2012.  (*Id.* at 611.)  She reported not taking her medication that day.  (*Id.*)  Notes from the visit explain hat Plaintiff was crying and very overwhelmed.  (*Id.*)

Plaintiff saw Juliet Schmitt, MFT at PCSD on July 21, 2012.  (*Id.* at 612.)  She reported that she had been taking her medication and "feeling a little better."  (*Id.*)

Plaintiff saw Juliet Schmitt, MFT at PCSD on July 14, 2012.  (*Id.* at 613.)  Notes from that visit state that Plaintiff's "functioning has declined due to noncompliance with meds after Josh broke up with her in June.  She admits that she felt bad, life sucks, etc. and felt there was no point of the effort to take her meds because 'life would suck anyway.'"  (*Id.*)

Plaintiff saw Michelle Kleiner, NP at PCSD on July 12, 2012.  (*Id.* at 540.)  Ms. Kleiner's notes from that visit state: "Pt [Patient] reports being compliant about meds until she was dumped by boyfriend 3 weeks ago.  Feeling more physical sxs [symptoms] of depression again (lethargy, decreased motivation), increased anxiety, coping ineffectively."  (*Id.*)

Plaintiff saw Michelle Kleiner, NP at PCSD on May 1, 2012.  (*Id.* at 541.)  Notes from that visit state that Plaintiff is still not taking her medication as prescribed, and never increased her dosage as discussed.  (*Id.*)  The notes further state that there has been no change in symptoms and Plaintiff continued to report decreased mood, irritability and

getting easily overwhelmed.  (*Id.*)

Plaintiff saw Michelle Kleiner, NP at PCSD on March 29, 2012.  (*Id.* at 542.) Notes from that visit state that Plaintiff reported taking her medication but her mother had called prior to the appointment to question whether Plaintiff is taking her medications because Plaintiff was making impulsive choices.  (*Id.*)  Notes further state that Plaintiff continues to be easily overwhelmed, easily irritated, low mood.  (*Id.*)  Plaintiff denied being impulsive but said she is making up for lost time, socially.  (*Id.*)

Plaintiff saw Juliet Schmitt, MFT at PCSD on February 3, 2012.  (*Id.* at 620.)  She admitted that she did not take her medication in January but now realizes that she has to be consistent.  (*Id.*)

Plaintiff saw Michelle Kleiner, NP at PCSD on February 2, 2012.  (*Id.* at 543.) She reported that she "detoxed" off all medication.  (*Id.*)  The notes state that Plaintiff reported the medications were not effective so she stopped taking them for the past month.  (*Id.*)  She has been back on medication for two days.  (*Id.*)  Plaintiff reported "good social support from school friends."  (*Id.*)

### c.  Treatment Records from 2011

Plaintiff saw Michelle Kleiner, NP at PCSD on December 6, 2011.  (*Id.* at 544.) Notes from that visit state that Plaintiff is inconsistent with her medication.  (*Id.*)  Notes further state, "Adderall XR definitely helps when she uses it."  (*Id.*)  Plaintiff noted a decrease in anxiety since starting her medication but no change in mood.  (*Id.*)

Plaintiff saw Juliet Schmitt, MFT at PCSD on October 25, 2011.  (*Id.* at 625.)  She discussed that she had seem Ms. Kleiner and "knows being consistent w/ meds is the best solution for feeling better—just needs to get back up to approp. dose and be consistent." (*Id.*)

Plaintiff saw Michelle Kleiner, NP at PCSD on October 23, 2011.  (*Id.* at 545.) Notes from that visit state that Plaintiff was off "ADD" medication for one year and felt that she focused ok, but her current classes required increased focus.  (*Id.*)  Notes also state that Plaintiff was off Lexapro for a while but "she is now ready to commit."  (*Id.*)

Plaintiff saw Juliet Schmitt, MFT at PCSD on August 6, 2011.  (*Id.* at 369.)  She reported that she does not like taking her medication because she has an over-reactive gag-reflex, which has led to an increase in anxiety and insomnia.  (*Id.*)

Plaintiff saw Juliet Schmitt, MFT at PCSD on July 30, 2011.  (*Id.* at 628.)  She reported having an increase in anxiety that week, "but it was due to inconsistency w/ meds and now she is feeling better."  (*Id.*)

Plaintiff saw Michelle Kleiner, NP at PCSD on May 23, 2011.  (*Id.* at 546.)  Notes from that visit state that Plaintiff is "doing really well overall.  Socially doing well. Looking for work for summer but not giving it her all."  (*Id.*)

Plaintiff saw Juliet Schmitt, MFT at PCSD on April 22, 2011.  (*Id.* at 634.)  Notes from that visit state that Plaintiff "is less depressed than last session and is able to have a more positive outlook (taking meds regularly) but is still very tired every day."  (*Id.*)

Plaintiff saw Juliet Schmitt, MFT at PCSD on April 1, 2011.  (*Id.* at 635.)  Notes from that visit state that Plaintiff "continues to be very overwhelmed by school and wants to give up and just relax and not have any stressors . . . She admits that she is non-compliant w/ her medication currently b/c [because] it hurts her stomach and it tastes bad if she 'does not eat the right amount of food with it.'"  (*Id.*)

Plaintiff saw Juliet Schmitt, MFT at PCSD on March 21, 2011.  (*Id.* at 636.)  Notes from that visit state that Plaintiff was "upset about workload," and "crying with intensity in session and said no options for anything positive" until Ms. Schmitt began working with her on a schedule for school, work and fun.  (*Id.*)  "By the end of the session she was in fairly good spirits."  (*Id.*)

Plaintiff saw Juliet Schmitt, MFT at PCSD on January 24, 2011.  (*Id.* at 638.) Notes from that visit state the following: "Pt [Patient] experiences 3 weeks of nightly panic due to preoccupation w/ thoughts about dying suddenly.  After a medication adjustment she is feeling better and not panicking, but some residual preoccupation w/not wanting to have to think about her eventual death.  Focused on ways to redirect her attention."  (*Id.*)

Plaintiff saw Michelle Kleiner, NP at PCSD on January 19, 2011. (*Id.* at 547.) Notes from that visit state that Plaintiff stopped all of her medications over Christmas break because she kept forgetting. (*Id.*) She reported having panic attacks consistently. (*Id.*) She started back on her medication two days ago, which has decreased the panic symptoms. (*Id.*)

### d.  Consultative Exam with Romualdo R. Rodriguez, M.D.

Plaintiff saw consultative examiner, Romualdo R. Rodriguez, M.D., a board eligible psychiatrist on March 21, 2012. (*Id.* at 388.) Dr. Rodriguez had the following diagnostic impressions of Plaintiff: Axis I: (1) ADHD per private physician, (2) Depressive disorder, not otherwise specified; (3) anxiety disorder, not otherwise specified. Axis II: No diagnosis. Axis III: Per medical reports. Axis IV: Psychosocial stressors over past year: minimal to moderate. Axis V: Current GAF: 65[1]. (*Id.* at 392.)

Dr. Rodriguez gave the following prognosis: From a psychiatric point of view, as long as the claimant is properly treated for ADHD and anxiety and depression, she could

---

[1] The Global Assessment of Functioning (GAF) score is a scale reflecting "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. 2000). The GAF scale ranges from 1 to 100 and is used by clinicians to indicate his or her overall judgment of a person's psychological, social, and occupational functioning on a scale devised by the American Psychiatric Association. *American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders* (Text Revision, 4th ed. 2000) (DSM-IV-TR). A GAF of 31-40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work, school, family relations, judgment, thinking or mood (e.g., depressed man avoids friends, neglects family and is unable to work[.])." A GAF of 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." A GAF of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.* A GAF of 61-70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.* It should be noted that the Ninth Circuit has observed that "[t]he Commissioner has determined the GAF scale "does not have a direct correlation to the severity requirements in [the Social Security Administration's] mental disorders listings." 65 Fed. Reg. 50, 746, 50, 765 (Aug. 21, 2000)." *McFarland v. Astrue*, 288 Fed.Appx. 357, 359 (9th Cir. 2008)(unpub.). In fact, GAF scoring has been removed from the DSM V for "lack of conceptual clarity." *Phillips v. Colvin*, 61 F.Supp.3d 925, 931 n.2 (N.D. Cal. 2014).

easily recover from her symptoms in the next twelve months.  (*Id.* at 393.)  Based on his examination, Dr. Rodriguez had the following functional assessment of Plaintiff:

1. Able to understand, remember, and carry out simple one or two-step job instructions.

2. Able to do detailed and complex instructions.

3. Minimally limited in her ability to relate and interact with supervisors, coworkers and the public.

4. Slightly limited in her ability to maintain concentration and attention, persistence and pace.

5. Minimally limited in her ability to adapt to the stresses common to a normal work environment.

6. Minimally limited in her ability to maintain regular attendance in the work place and perform work activities on a consistent basis.

7. Minimally limited in her ability to perform work activities without special or additional supervision.

(*Id.* at 393.)

### e.  Opinion Letter from Julie Schmitt, M.A., MFT

Julie Schmitt, M.A., MFT submitted a letter regarding Plaintiff on May 11, 2012. (*Id.* at 401.)  In her letter, Ms. Schmitt states that she has worked with Plaintiff in psychotherapy since 2008.  (*Id.*)  Ms. Schmitt states that Plaintiff has "suffered from symptoms of Asperger's Syndrome, bipolar disorder, anxiety, and attention deficit hyperactivity disorder."  (*Id.*)  Ms. Schmitt states that Plaintiff "has not been able to sustain motivation, positive outlook, self-confidence, or proper self-care for an adequate amount of time to achieve positive results long-term.  She has not displayed any consistent signs of being able to live independently or maintain employment."  (*Id.*)

### f.  Opinion Letter from Michelle R. Kleiner, RN, CNP

Michelle R. Kleiner, RN, CNP also wrote a letter on behalf of Plaintiff on May 15, 2012.  (*Id.* at 402.)  In her letter, Ms. Kleiner states that Plaintiff has been under her care

for medication management since October 9, 2007. (*Id.*) According to Ms. Kleiner, Plaintiff "remains quite symptomatic which prevents her from achieving a healthy level of functioning." (*Id.*) Ms. Kleiner states that Plaintiff is not compliant with her medication without help from her mother. (*Id.*) Ms. Kleiner states that Plaintiff "exhibits persistent symptoms including depressed mood, emotional reactivity, lethargy, focusing difficulties, poor frustration tolerance, poor organizational skills, high anxiety, poor body image, and low motivation." (*Id.*) Ms. Kleiner further states that Plaintiff "has not displayed any consistent signs that would indicate that she is able to live independently or maintain employment." (*Id.*) Ms. Kleiner offered the following diagnostic impressions of Plaintiff: Bipolar II Disorder, Asperger's Disorder, ADHD, Inattentive Type. (*Id.*)

Ms. Kleiner wrote another letter regarding Plaintiff on September 12, 2013. (*Id.* at 470.) In that letter, Ms. Kleiner states that Plaintiff "remains non-compliant with her medications unless her mother oversees them. Despite attending weekly counseling sessions and when exhibiting compliance with her medications, she continues to be quite symptomatic which impairs her significantly. As a result, [Plaintiff] continues to be unable to live independently and maintain employment." (*Id.*)

### g. Opinion Letter from Todd D. Pizitz, Ph.D.

Todd D. Pizitz, Ph.D, clinical and forensic psychologist, wrote a letter regarding Plaintiff on November 12, 2012, in which he provides a report from January 6, 2012 sent to the State of California Department of Social Services on behalf of Plaintiff. (*Id.* at 456.) Dr. Pizitz explains in his letter that Plaintiff saw him for psychological evaluations on September 15, 2011; September 23, 2011 and October 13, 2011. (*Id.* at 456-57.) Dr. Pizitz concluded that Plaintiff "met criteria for Generalized Anxiety Disorder, Depressive Disorder N.O.S., Attention Deficit/Hyperactivity disorder, and symptoms of Asperger's disorder" based on a psychosocial interview, an interview with Plaintiff's mother, his behavioral observations of Plaintiff, and Plaintiff's assessment results. (*Id.* at 457.) Dr. Pizitz states in his letter that Plaintiff's "mental health symptoms are likely impeding her ability to interact in an age-appropriate manner, her daily functioning and her activities of

daily living." (*Id.*)  Dr. Pizitz's letter states the following prognosis of Plaintiff: "Ms. Traugh's mental health substantially limits her ability to connect with others and to handle stressful situations in an age-appropriate manner.  Moreover, she presents as having difficulty with sustained attention and persistence on meaningless tasks." (*Id.*)

### h.  Opinion Letters from Anil Patel, MD

#### i.  2012 Mental Impairment Questionnaire

Dr. Patel filled out a "Mental Impairment Questionnaire" regarding Plaintiff on December 13, 2012.  (*Id.* at 463-68.)  This questionnaire states that Dr. Patel has been seeing Plaintiff on a monthly basis since October 9, 2007.  (*Id.*)  With respect to the DSM-IV multiaxial evaluation Dr. Patel wrote the following: Axis I: Bipolar II/ADHD/Asperger's Disorder; Axis II: Referred; Axis II: Von Willebrand's Disease; Axis IV: Moderate; Axis V: Current GAF 50, Highest GAF past year: 50.  (*Id.*)  Dr. Patel stated that Plaintiff had not been compliant with treatment so her response to treatment cannot be adequately evaluated.  (*Id.*)

Dr. Patel stated the following "clinical findings": "She displays poor problem solving skills, poor insight, impaired judgment, concrete thinking and an inability to see or plan ahead." (*Id.*)  With respect to Plaintiff's prognosis, Dr. Patel wrote "poor." (*Id.*)  Dr. Patel checked boxes on the questionnaire regarding Plaintiff's "signs and symptoms," and her ability to work related activities.  (*Id.* at 464-65.)  Dr. Patel explained, "This patient requires frequent breaks because she is unable to withstand stress.  School is an example of this.  Last semester this patient took a sewing class in which she frequently displayed mood [word illegible] and the need to be escorted out of the classroom . . ." [The last sentence is omitted as illegible]  (*Id.* at 465.)

Dr. Patel further writes, "She is unable to carry out assignments at the college level.  Her mother assists patient with all things academic.  Poor decision making and goal setting is evident.  For example, she accepted a live in child care provider position which included living in the pantry as her bedroom and earning $60 for 60+ hours of work weekly." (*Id.* at 466.)  Dr. Patel also writes, "Her mother oversees all basic

standards of neatness and cleanliness.  She requires assistance when going to unfamiliar places due to anxiety, getting lost, etc." (*Id.* at 466.)

### ii.  2013 Letter

Dr. Patel wrote a second letter on behalf of Plaintiff on December 19, 2013 in response to the report from Kenneth Lynch, LD, PhD from December 12, 2013.  (*Id.* at 649.)  In the letter, Dr. Patel acknowledges that "Dr. Lynch's observations capture a brief picture of [Plaintiff's] behavior in that moment" which is "highly inaccurate." (*Id.*)  Dr. Patel continues, "While Mary can often present herself as articulate, intelligent and capable during a short encounter, thirteen years of medical and psychological history cannot be denied and years of consistent, predictable dysfunction demonstrate that [Plaintiff] is currently incapable of keeping up that 'appearance of ability' for any meaningful, extended period of time.  (*Id.*)  Dr. Patel provides a number of examples of why Dr. Lynch's report is inaccurate.  For example, Dr. Patel states that "[w]hile [Plaintiff] professed to an ability to read college-level texts, she functions in classes at college only when her mother reads the texts to her and helps with homework, and often her mother must sit in class to facilitate appropriate behavior.  Even with this help, [Plaintiff] is on academic probation." (*Id.*)  Dr. Patel states that Plaintiff's self-descriptions evidenced in Dr. Lynch's report "are inaccurate and reflect her desires rather than the reality of her current abilities." (*Id.*)  Dr. Patel concludes the letter by saying that her office "has observed [Plaintiff] make continuous, minimal advancements in her overall mental and physical health issues." (*Id.* at 650.)  Moreover, her office's "assessment of [Plaintiff's] current ability to function independently over any extended period of time . . . bear no resemblance to the snap-shot assessment based on the short December 12, 2013 observation." (*Id.*)

### i.  Opinion Letter from Juliet Schmitt

Juliet Schmitt, MFT, wrote a letter on behalf of Plaintiff on September 20, 2013. (*Id.* at 469.)  Ms. Schmitt states in her letter that she has been working with Plaintiff for several years.  (*Id.*)  According to Ms. Schmitt, despite the fact that Plaintiff "attends

regular therapy sessions, she continues to seriously struggle in daily functioning." (*Id.*)
Ms. Schmitt explains that Plaintiff

> cannot grasp the fact that it is unhealthy or her and unpleasant for those
> around her when she refuses to brush her teeth, wash her face, brush her
> hair, or take a shower more often than every three days.  She cannot take her
> medication consistently without her parents prompting her every day.  She
> cannot find or maintain an internship unless her father finds one for her at
> the school where he teaches and with which she has been familiar for years.

(*Id.*)  According to Ms. Schmitt, Plaintiff's "development has been seriously impacted by
her psychological impairments.  She cannot properly care for herself on a daily basis, she
cannot find or maintain employment, and she cannot live independently." (*Id.*)

### j.  Medical Source Statement from Kenneth R. Lynch, J.D. Ph.D.

Dr. Lynch performed a psychological disability examination on December 11,
2013.  (*Id.* at 642.)  During this evaluation, Dr. Lynch administered the following tests:
Psychological Consultation, Wechsler Adult intelligence Scale IV (WA4), WMS-4, and
Trails.  (*Id.*)  Dr. Lynch described Plaintiff as "a high functioning female who looked her
chronological age of 21." (*Id.* at 643.)  Dr. Lynch further stated "The claimant was
responsive and alert during the testing process.  She is oriented to her surroundings
including person, place and time.  She appeared to be in no distress.  She denies current
suicide thought, plan or gesture but admits past suicide thoughts." (*Id.*)

With respect to Dr. Lynch's examination of Plaintiff's mood, he reported
that

> [a]lthough a past history of depression is reported, the claimant's mood
> seemed normal.  She denied significant depression.  The claimant describes
> 'melt downs' or mood swings which have significantly decreased with her
> new medication regimen but she is periodically non-compliant.  She denied
> current suicide ideation, plan or gesture but admits past suicide thoughts.
> She manifested no signs of clinical depression and no signs of significant

anxiety.  She did not satisfy the ASM V criteria for Major Depression, Dysthymic Disorder or Bi-Polar Disorder (One or Two).  She does satisfy DSM V criteria for Cyclothymic disorder with Anxiety that is medication controlled.

(*Id.* at 645.)

## IV.   HEARING BEFORE THE ALJ

### a.   Plaintiff's Testimony

Plaintiff is twenty-one years old.  (*Id.* at 35.)  She attended high school at Guajome Park Academy where she was in "special ed[.]"  (*Id.* at 37.)  She is not currently taking college classes, but will enroll again next semester at Palomar Community College.  (*Id.* at 37.)  Plaintiff uses the disabled student services at Palomar.  (*Id.* at 42.)  She usually only takes one class per semester because whenever she takes multiple classes she has "a difficult time because of [her] anxiety and depression[.]"  (*Id.* at 37.)  Eventually, Plaintiff hopes to get her certificate so she can be an assistant preschool teacher, and eventually an actual preschool teacher.  (*Id.* at 40-41.)  She will get her certificate for early childhood education in June.  (*Id.* at 36-37.)

Plaintiff has been volunteering as an assistant preschool teacher at Garrison Elementary School, which she does three times a week from 9:00am to 12:00pm.  (*Id.* at 36.)  Plaintiff does not think she can work on a full time basis because she needs to be "instructed for multiple times" on what to do and she needs to be "constantly reminded" of what she needs to do.  (*Id.* at 43.)  Sometimes when she is volunteering, she needs to be reminded to sharpen pencils or to keep working, because she forgets what she is doing.  (*Id.*)  She enjoys working at the preschool but some days she has panic attacks and bouts of depression.  (*Id.* at 36.)  At least once a week, her depression and anxiety prevents her from being able to work.  (*Id.* at 43.) Plaintiff was able to get her position as a volunteer at the preschool because her dad is a music teacher at the same school.  (*Id.* at 41.)  She testifies that her dad watches over her volunteering, and drives her there.  (*Id.*)

Plaintiff passed her written driving test, but once she started driving she had a

panic attack.  (*Id.* at 35.)  She took the driving test once, and might try again in the future.  (*Id.* at 35-36.)  She uses public transportation but "oftentimes" gets lost.  (*Id.* at 35.)  Whenever she can't take public transportation, Plaintiff walks.  (*Id.* at 41.)

When she is not in school, Plaintiff likes to role-play, draw and write.  (*Id.* at 40.)  At one point, she wanted to be a cartoonist.  (*Id.*)  She no longer takes art classes, but she is still drawing sometimes between an hour and four hours in a day.  (*Id.*)  Plaintiff testifies that she will get together with friends she met at school to play on their computers together.  (*Id.*)  She has a swing at home that she uses for about an hour a day to relieve stress which she has been doing for "as long as [she] can remember."  (*Id.* at 41.)  Plaintiff explained that people scare her, so she brings her bunny with her in stressful situations.  (*Id.* at 43.)  Plaintiff brought a bunny to her hearing because she was "very anxious" and "scared."  (*Id.*)

Plaintiff testifies that she is currently in counseling at "PCSD" (Psychiatric Centers at San Diego) in San Marcos where she has been seeing Juliet Schmitt for four or five years.  (*Id.* at 44.)  She also sees Dr. Patel for her medications, but not for counseling.  (*Id.*)  Dr. Pizitz is "the man who told [her] that [she] had Asperger's" and she saw him "for about a month . . . [j]ust to get the ruling that [she] had Asperger's."  (*Id.*)

Plaintiff testifies that at some point she got off of her medications.  (*Id.* at 38.)  She explains that she has ADD[2] and "tend[s] to forget" her medications, which causes more depression and anxiety and causes her to have heavy bleeds.  (*Id.* at 38-39.)  She used to go on and off her medication, but has been "pretty regular on [her] medication" since she moved.  (*Id.* at 39.)  Plaintiff testified that she is currently taking Zoloft and Abilify and is doing "pretty well."  She explains that sometimes she has "breakthrough bleed[s]" with her birth control pill and will have a period for two months, which "causes fatigue[.]"  (*Id.* at 38.)  The medications control her anxiety "for the most part" but she has panic

---

[2] Plaintiff testifies that she has Attention Deficit Disorder ("ADD").  Other records indicate that Plaintiff has been diagnosed with Attention Deficit Hyperactive Disorder ("ADHD").  The two diagnosis are used interchangeably in the record, which is reflected in this opinion.

attacks when she is under a lot of stress.  (*Id.* at 39.)  When she gets a panic attack she gets "lightheaded" and gets "the shakes" and her "heart will start to race" at which point she needs to excuse herself so she can cry.  (*Id.*)  Her panic attacks can last between ten minutes and an hour.  (*Id.*)  Her last panic attack was the morning of the hearing.  (*Id.*)

Plaintiff testifies that she was born with a second uterus that was dysfunctional, so it would swell up with blood, which stimulated a bleeding disorder.  (*Id.* at 42.)  Plaintiff explained that, because she was bleeding and in pain all the time, it would cause extreme fatigue which made it difficult for her to attend school.  (*Id.*)  Plaintiff "was in the hospital a lot."  (*Id.*)  This has caused her emotional problems, which have lasted throughout her school years.  (*Id.*)

### b. Susan Traugh's Testimony

Susan Traugh, Plaintiff's mother, also testified at the hearing.  (*Id.* at 45.)  Ms. Traugh testified that Plaintiff sees Michelle Kleiner, a nurse practitioner, who consults with Dr. Patel during each visit.  (*Id.* at 46.)  Plaintiff sees Ms. Kleiner, instead of Dr. Patel, partly because their insurance "insists that that's the way it happens" and "partly because [Plaintiff] doesn't do well with men."  (*Id.*)  Plaintiff also sees a therapist, Julie Schmitt, weekly.  (*Id.*)  Ms. Traugh does not know how long Plaintiff has been seeing Ms. Schmitt specifically, but she has been at "PCSD" since she was eight years old.  (*Id.*)

Ms. Traugh testifies that Plaintiff has Von Willebrand disease, which means in her case that her period never stops unless she takes medication.  (*Id.*)  Plaintiff was born with two uteruses, which caused her excruciating pain because the uterus would fill up with menstrual blood and could not drain, because it was not attached to a vagina.  (*Id.* at 46-47.)  For eight years she was in and out of emergency rooms and hospitals, sometimes twice a week.  (*Id.* at 47.)  Ms. Traugh explained that Plaintiff "ended up not wanting to be with people, not wanting to associate with people and people didn't want to associate with her because her behavior was considered inappropriate."  (*Id.*)  They later learned her behavior was a result of the pain she was feeling from her uterus medical issue, but before everyone thought she had a "psychological problem."  (*Id.*)  When Plaintiff was

sixteen years old, she had a laparoscopy where they discovered the two uteruses and removed one.  (*Id.*)  According to Ms. Traugh, that operation "changed [Plaintiff's] life."  (*Id.*)  Ms. Traugh testified that Plaintiff's therapist, Michelle Kleiner has said that the psychological damage was "as if [Plaintiff] had been a prisoner of war for eight years."  (*Id.*)

Ms. Traugh testified that Plaintiff is developmentally still a child, and gets overwhelmed in any situation she finds anxiety producing.  (*Id.* at 48.)  At her volunteer position at the preschool, Plaintiff ends up going home at least once every other week because she "melts down[.]"  (*Id.*)  Ms. Traugh thinks that one day Plaintiff will be a "really good preschool assistant.  She's just not there yet."  (*Id.* at 51.)

The same melt downs happen at school.  (*Id.* at 48.)  Her school assigned her an aid in her sewing class because Plaintiff was disruptive.  (*Id.*)  Even though Plaintiff is a "gifted artist," Plaintiff failed an art class because the pressure was too much and she did not finish assignments or stay in the classroom to participate.  (*Id.*)  Ms. Traugh has had herself assigned as an aid so she can accompany Plaintiff to other college classes to "keep her calmed down" so she can "do what she needs to do to get through the college course."  (*Id.* at 48-49.)

Ms. Traugh checks Plaintiff's medicine case every day to make sure she takes her medication.  (*Id.* at 49.)  Ms. Traugh helps make sure Plaintiff takes showers, brushes her teeth, combs her hair, wears clean clothes and uses sanitary products.  (*Id.*)  Ms. Traugh states that Plaintiff has "been known to set her macaroni and cheese on fire on the stove and walk away and not notice that the fire alarm is going."  (*Id.*)  As a result, Plaintiff is not allowed to cook without her mother being present.  (*Id.*)

Ms. Traugh explains that Plaintiff has a "very small group of friends that are special like [Plaintiff] is[.]"  (*Id.*)  They get on their computers and sit next to each other and they role-play, but do not do "regular socializing."  (*Id.*)  Plaintiff likes going to movies, but she does not go very often because her group of friends are not great at planning social events, so she only goes once or twice a year.  (*Id.* at 51.)  If Plaintiff is in

a manic episode, she will draw 150 pictures all day and all night.  (*Id.*)  Chores are difficult for Plaintiff, so she does them with her mother.  (*Id.* at 50.)

Ms. Traugh describes Plaintiff as smart, but notes that she is on academic probation.  (*Id.*)  If Ms. Traugh goes with Plaintiff to class to "help her be appropriate and manage her time" Plaintiff can get As and Bs.  (*Id.*)  Otherwise, Plaintiff gets Fs.  (*Id.*)

### c.  Vocational Expert's Testimony

Dr. Alan Cummins testified as the Vocational Expert.  (*Id.* at 34.)  The ALJ asked the Vocational Expert ("VE") to

> assume a hypothetical individual of the claimant's age, education, no work experience.  Assume this person is restricted to a medium range of work, no work on unprotected heights, no work on dangerous moving machinery, no ladders, simple repetitive tasks, no intense sustained interaction with the public, coworkers or supervisors, no fast paced work such as conveyer belt or piece work and no responsibility for the safety of others.

(*Id.* at 52.)  The VE testified that with the proposed limitations, a claimant could perform the following jobs:

1. Packager (*Dictionary of Occupational Titles ("DOT")* 902.587-018, which is medium, unskilled with an SVP of 2, of which there are 660,000 jobs in the national economy.  (*Id.*)

2. Assembler (*DOT* 709.684-014, which is medium, unskilled, with an SVP of 2, of which there are 220,000 jobs in the national economy.  (*Id.*)

3. Cleaner (*DOT* 381.687-018, which is medium, unskilled, with an SVP of 2, of which there are 2,000,000 jobs in the national economy.  (*Id.*)

The VE stated that his testimony was consistent with the *Dictionary of Occupational Titles*.  (*Id.*)

For the second hypothetical, the ALJ asked the VE to "assume a hypothetical individual with the same restrictions as in one.  This person would be off task at least 20 percent of the time due to anxiety disorder and inability to

maintain their concentration, persistence or pace." (*Id.* at 53.)  The VE testified
that was "likely to be beyond most employer's tolerance." (*Id.*)

### d.  ALJ's Findings

On February 7, 2014, the ALJ issued his decision denying Plaintiff's application
for supplemental security income. (*Id.* at 25.)  In reaching his decision, the ALJ applied
the Commissioner's five-step sequential disability determination process set forth in 20
C.F.R. § 404.1520 and described above. (*Id.* at 13-25.)

### i.  Step One

The ALJ found that Plaintiff had not engaged in substantial gainful activity since
September 30, 2011, when she applied for social security benefits. (*Id.* at 15.)

### ii.  Step Two

At step two, the ALJ found that Plaintiff had the following severe impairments:
Von Willebrand's Disease, obesity, a history of attention deficit hyperactivity disorder
(ADHD); and a cyclothymic disorder with anxious distress. (*Id.*)

The ALJ noted in this analysis that Plaintiff's weight, including the impact on her
ability to ambulate as well as well as her other body systems, was considered within the
functional limitations he determined. (*Id.*)  With respect to Plaintiff's alleged symptoms
of Asperger's, the ALJ noted that there were no medical signs or laboratory findings to
substantiate the existence of a medically determinable impairment. (*Id.*)  Although
Plaintiff was diagnosed with Asperger's by Todd D. Pizitz, Ph.D., with symptoms of
Asperger's disorder, "that diagnosis did not result from anatomical, physiological, or
psychological abnormalities that are demonstrable by medically acceptable clinical or
laboratory diagnostic techniques." (*Id.* at 15-16.)  The ALJ concluded that there was "a
lack of objective evidence to substantiate the existence of a medically determinable
impairment of Asperger's syndrome." (*Id.* at 16.)

### iii.  Step Three

At step three, the ALJ found that Plaintiff did not have an impairment or
combination of impairments that meets or medically equals the severity of one of the

listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).  (*Id.*)  Specifically, the ALJ considered Plaintiff's impairment under Listing 14.06 and determined that Plaintiff's "physical impairment does not meet or medically equal the criteria of any medical listing."  (*Id.*)  The ALJ noted that no treating or examining physician has recorded findings equivalent in severity to the criteria of any listed impairment, nor does the evidence show medical findings that are the same or equivalent to those of any listed impairment.  (*Id.*)

The ALJ also considered Plaintiff's mental impairments "singly and in combination" and determined they do not meet or medically equal the criteria of Listings 12.02, 12.04 and 12.06.  (*Id.* at 16.)  In making this finding, the ALJ considered whether Plaintiff satisfied the "paragraph B" criteria, which requires the mental impairment to result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.  (*Id.* at 16.)  The ALJ noted that a marked limitation means more than moderate but less than extreme.  (*Id.* at 16.)  Repeated episodes of decompensation, each of extended duration, means three episodes within one year, or an average of once every four months, each lasting for at least two weeks.  (*Id.* at 16.)

The ALJ found that Plaintiff had moderate restrictions with respect to her activities of daily living.  (*Id.* at 16.)  He noted that Plaintiff reported brushing her teeth once a day and showering every other day.  (*Id.* at 16.)  Plaintiff reported that she could make her own meals, but her mother reported that she needed to be supervised because she had left things burning on the stove.  (*Id.* at 16.)  In her hearing testimony, Plaintiff stated that she used public transportation, but often got lost.  (*Id.* at 16.)  In December of 2012, however, therapy records state that Plaintiff drove across country to Louisiana to help a friend move, and was to take a plane back home.  (*Id.* at 16.)  More recently in December of 2013, Plaintiff reported her daily activities as "getting up in the morning, taking care of her own personal hygiene, and taking the bus or the train to Palomar college where she

took classes, worked part-time, and socialized." (*Id.* at 16.)  Accordingly, the ALJ found that "while [Plaintiff] may have some moderate restrictions due to her cyclothymic disorder, her records reveal that she can for the most part, independently and effectively participate in her own activities of daily living." (*Id.* at 16.)

The ALJ found that Plaintiff had moderate difficulties in social functioning. (*Id.* at 16.)  Plaintiff testified that she played on the computer with her friends, went to their houses, and hung out with them at school. (*Id.* at 16.)  Plaintiff's therapy records reveal that she has had a couple of boyfriends and was even allowed to travel to Louisiana. (*Id.* at 16.)  The ALJ concluded that Plaintiff can interact independently and effectively with other individuals on a sustained basis, but due to her bouts of anxiety, may have moderate difficulties at times. (*Id.* at 16-17.)

The ALJ found that Plaintiff had moderate difficulties with regard to concentration, persistence or pace. (*Id.* at 17.)  The ALJ concluded that, despite her ability to focus during the psychological consultative examination on December 11, 2013, and based on Plaintiff's history of ADHD, she would have moderate difficulties in the areas of concentration, persistence and pace without medication. (*Id.* at 17.)

The ALJ found that Plaintiff had not experienced any episodes of decompensation of extended duration. (*Id.* at 17.)  Accordingly, because the ALJ found that Plaintiff's mental impairments do not cause at least two marked limitations or one marked limitation and repeated episodes of decompensation, each of extended duration, the "paragraph B" criteria are not satisfied. (*Id.* at 17.)

The ALJ also considered whether Plaintiff's mental impairments satisfied the "paragraph C" criteria of Listings 12.02 and 12.04. (*Id.* at 17.)  The ALJ noted that there was

> no evidence of repeated episodes of decompensation of extended duration, a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands of change in the environment would be predictable to cause the individual to decompensate, or current

history of one or more years' inability to function outside a highly

supporting living arrangement with an indication of continued need for such

an arrangement.

(*Id.* at 17.)  Accordingly the ALJ concluded that the evidence failed to establish the

presence of the "paragraph C" criteria of listings 12.02 or 12.04.  (*Id.* at 17.)

The ALJ also considered whether the "paragraph C" criteria of Listing 12.06 were

satisfied.  (*Id.* at 17.)  To satisfy the "paragraph C" criteria of listing 12.06, the anxiety

related disorder must result in complete inability to function independently outside the

area of one's home.  (*Id.* at 17.)  The ALJ noted that only one anxiety episode was

recorded in any of the twenty-five sessions that took place during 2013.  (*Id.* at 17.)  The

notes on that incident state that Plaintiff was able to return to work two days later and

continued to visit friends at the college outside her home.  (*Id.* at 17.)  As a result, the

ALJ concluded that "the evidence fails to establish the presence of the 'paragraph C'

criteria of Listing 12.06."  (*Id.* at 17.)

### iv.  Step Four

At step four, the ALJ found that Plaintiff has no past relevant work.  (*Id.* at 23.)

Therefore, the ALJ proceeded to step five.

### v.  Step Five

At step five, The ALJ noted that Plaintiff was nineteen years old on the date her

application was filed.  (*Id.* at 23.)  She has at least a high school education and is able to

communicate in English.  (*Id.* at 23.)  Plaintiff has no past relevant work.  (*Id.* at 23.)  As

a result, and considering Plaintiff's age, education, work experience and residual

functional capacity, the ALJ found that there are jobs that exist in significant numbers in

the national economy that Plaintiff can perform.  (*Id.* at 23.)

### 1.  Residual Functional Capacity

The ALJ determined that Plaintiff had the following Residual Functional Capacity:

Plaintiff can perform "medium work as defined in 20 CFR 416.967(c) except no work on

unprotected heights, ladders, or dangerous machinery.  The claimant cannot complete

fast-paced work such as conveyor belt or piecework.  Additionally, the claimant is limited to simple, repetitive tasks with no intense, sustained interaction with the public." (*Id.* at 18.)  In making this finding, the ALJ considered all of Plaintiff's symptoms and the extent to which those symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 416.929 and SSRs 96-4p and 96-7p.  (*Id.* at 18.)  The ALJ also considered opinion evidence.  (*Id.* at 18.)

In considering Plaintiff's symptoms, the ALJ must follow a two-step process in which he must first determine whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's pain or other symptoms.  (*Id.* at 18.)  Second, the ALJ must evaluate the intensity, persistence and limiting effects of those symptoms to determine the extent to which they limit the claimant's functioning.  (*Id.* at 18.)  For this purpose, whenever statements about the intensity, persistence or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the statements based on a consideration of the entire case record.  (*Id.* at 18.)

### 2.  Credibility Determination

The ALJ determined that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but Plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms are not entirely credible.  (*Id.* at 19.)  Specifically, with respect to Plaintiff's alleged Von Willebrand's disease, the ALJ noted that the objective medical evidence "reveals that the claimant's condition was stable."  (*Id.* at 19.)  With respect to Plaintiff's mental disorders, the ALJ noted that Plaintiff was being "treated on a regular and routine basis."  (*Id.* at 19.)  The ALJ noted that the record indicated Plaintiff's noncompliance with her medications, which could demonstrate "a possible unwillingness to do that which is necessary to improve her condition" or "an indication that her symptoms are not as severe as she

purports." (*Id.* at 19.)

With respect to Plaintiff's ADHD, the ALJ noted that the medical records reveal that the medications have been "relatively effective in controlling the claimant's symptoms." (*Id.* at 19-20.) The ALJ noted that "despite the fact that some of her activities of daily living were somewhat limited, some of the physical and mental abilities and social interactions required in order to perform her reported activities are the same as those necessary for obtaining and maintaining employment and are inconsistent with the presence of an incapacitating or debilitating condition." (*Id.* at 20.) The ALJ emphasized Plaintiff's ability to participate in her volunteer work at a preschool, taking college courses and hanging out with friends "undermines the credibility of the claimant's allegations of disabling functional limitations." (*Id.* at 20.) The ALJ further noted that, to receive benefits, a claimant must follow treatment as prescribed by her treating physician if this treatment can restore her ability to work. (*Id.* at 20 citing 20 CFR 416.930(a).) Absent good reason, a claimant may be found not disabled for failure to comply with prescribed treatment. (*Id.* at 20 citing 20 CFR 416.930(b).) Although the ALJ stated this was not the primary basis for his decision, Plaintiff's failure to follow her prescribed treatment is a basis for finding her not disabled. (*Id.* at 20.)

### 3. Opinion Evidence

In determining Plaintiff's physical RFC, the ALJ considered and gave little weight to the opinions of the State agency medical consultants on initial and reconsideration review. (*Id.* at 20.) The initial review opined that Plaintiff's initial impairment of Von Willebrand's disease was non-severe. (*Id.* at 20.) At reconsideration, the State agency consultants "opined that the claimant was limited to a light level of exertion with no corresponding analysis." (*Id.* at 20.) The ALJ noted that the reconsideration opinion was "conclusory" and provided "little explanation of the evidence relied on in forming that opinion." (*Id.* at 20.) The ALJ concluded that, due to Plaintiff's obesity and the stability of her Von Willebrand's disease, it is reasonable to conclude that she is limited to a medium exertional level of work with environmental limitations to ensure safety. (*Id.* at

20.)

In determining Plaintiff's mental RFC, the ALJ gave significant weight to the opinion of the State agency mental medical consultants on reconsideration review, who opined that the claimant would have difficultly sustaining the extended attention and concentration required for the timely completion of complicated tasks, but could persist on tasks at an adequate pace if not expected to maintain a pressured pace.  (*Id.* at 20.)  The State agency mental medical consultants on reconsideration review also stated that Plaintiff should not be expected to cope with the stress of frequent, intensive interactions with the public, but could accept supervisory direction.  (*Id.* at 21.)  The ALJ found this opinion "highly credible" because it is supported by the objective medical evidence and is consistent with the record as a whole, including Plaintiff's activities of daily living and her "thoroughly documented therapy notes."  (*Id.* at 21.)  The ALJ considered, and gave little weight to the opinions of the consultative examiners and the State agency medical consultants on initial review who all found Plaintiff had no severe mental impairments, and thus no corresponding limitations.  (*Id.* at 21.)  The ALJ disagreed, and found that the objective medical evidence "clearly shows" that Plaintiff's mental impairments are "severe and could reasonably cause limitations[.]"  (*Id.* at 21.)

The ALJ considered the opinion of Juliet Schmitt, an MFT, who assessed that Plaintiff was not capable of properly caring for herself, finding or maintaining employment, or living independently.  (*Id.* at 21.)  The ALJ noted that this opinion is not from an acceptable medical source, so he gave it less weight than other qualifying medical source opinions.  (*Id.* at 21 citing 20 CFR 416.913(a)(e).)  The ALJ also noted that Ms. Schmitt's opinions are inconsistent with her treatment records, and failed to mention that Plaintiff had been consistently noncompliant with medications.  (*Id.* at 21.)  The ALJ found that, because Ms. Schmitt's statements "appear to contain inconsistencies," those opinions are "less persuasive."  (*Id.* at 21.)

The ALJ also reviewed the statements of nurse practitioner, Michelle Kleiner, who opined that Plaintiff has not displayed any signs that she is capable of living

independently or maintaining employment.  (*Id.* at 21.)  The ALJ noted that this opinion is not from an acceptable medical source, and he thus assigned it less weight than other qualifying medical source opinions.  (*Id.* at 21 citing 20 CFR 416.913(a)(e).)  The ALJ also noted that, although the nurse practitioner had a treating relationship with Plaintiff, the documented treating history is "quite brief."  (*Id.* at 21.)  Additionally, Ms. Kleiner's treatment notes consisted primarily of Plaintiff's subjective complaints, with no medically acceptable clinical or diagnostic findings to support her functional assessment. (*Id.* at 21.)  The ALJ found Ms. Kleiner's opinion inconsistent with the objective medical evidence that shows Plaintiff is stable when she takes her medication, and is inconsistent with Plaintiff's admitted activities of daily living.  (*Id.* at 21.)

The ALJ read and considered the Mental Impairment Questionnaire completed by Anil Patel, M.D., on December 13, 2012.  (*Id.* at 22.)  The ALJ found the questionnaire to have "no probative value because there is no objective evidence from Dr. Patel."  (*Id.* at 22.)  The ALJ found that Dr. Patel "apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant's mother and seemed to uncritically accept as true most, if not all, of what she reported."  (*Id.* at 22.)  However, the ALJ found "good reasons for questioning the reliability of the mother's subjective complaints."  (*Id.* at 22.)

The ALJ read and considered the statement from Todd D. Pizitz, dated January 6, 2012.  (*Id.* at 22.)  The ALJ gave Dr. Pizitz's opinion no weight because he only saw the claimant three times, and the "treating relationship did not last long enough for Dr. Pizitz to have obtained a longitudinal picture of the claimant's medical condition."  (*Id.* at 22.) As a result, the ALJ found that his opinion does not merit the same weight that would be given to a treating physician with a longer treating relationship.  (*Id.* at 22.)  The ALJ also emphasized that the Plaintiff saw Dr. Pizitz to generate evidence for her disability case and Plaintiff's mother specifically requested a formal diagnosis of Asperger's syndrome. (*Id.* at 22.)  The ALJ acknowledged that the evidence from Dr. Pizitz is legitimate and deserves "due consideration, the context in which it was produced cannot be entirely

ignored." (*Id.* at 22.)

The ALJ also considered, and gave little weight to, the third-party statements of the claimant's mother because she is not a medical professional. (*Id.* at 22-23.) As a lay witness, the ALJ noted that Plaintiff' mother is not competent to make a diagnosis or to argue the severity of Plaintiff's symptoms in relationship to her ability to work. (*Id.* at 23.) The ALJ also noted that Plaintiff's mother has a "familial interest in seeing the claimant receive benefits," and thus, has a biased opinion. (*Id.* at 23.) The ALJ found the Plaintiff's mother's statements were not credible to the extent they were inconsistent with his determinations. (*Id.* at 23.)

The ALJ also reviewed and considered the third-party statements of Cheryl Doe, Plaintiff's tutor, and Kim Maler, Head of Security at Guajome Park Academy. (*Id.* at 23.) According to the ALJ, Ms. Doe's report "appears to rely heavily on information provided by the claimant's mother" and Ms. Doe was "obviously not privy to the claimant's medical records that reveal an overall non-compliance with medications." (*Id.* at 23.) As a result, the ALJ gave Ms. Doe's opinions "very little weight." (*Id.* at 23.) As for Ms. Maler, because she worked with Plaintiff prior to her application date the ALJ also gave her opinions "very little weight." (*Id.* at 23.)

### 4.  Plaintiff Can Perform Jobs that Exist in Significant Numbers in the National Economy

The ALJ found that Plaintiff's ability to perform all or substantially all of the requirements of "medium work" has been impeded by additional limitations. (*Id.* at 24.) To determine the extent to which those limitations eroded the unskilled medium occupational base, the ALJ relied on the testimony from the vocational expert as to whether jobs exist in the national economy for an individual with Plaintiff's age, education, work experience and residual functional capacity. (*Id.* at 24.) The ALJ found that the VE's testimony was consistent with the information contained in the Dictionary of Occupational Titles. (*Id.* at 24.) Based on that testimony, the ALJ concluded that, based on Plaintiff's age, education, work experience and residual functional capacity, she

is capable of making a successful adjustment to other work that exists in significant numbers in the national economy and is, therefore, not disabled.  (*Id.* at 24.)

## V.    SCOPE OF REVIEW

Section 205(g) of the Social Security Act allows unsuccessful applicants to seek judicial review of a final agency decision.  42 U.S.C. § 405(g).  The scope of judicial review is limited.  *Id.*  This Court has jurisdiction to enter a judgment affirming, modifying, or reversing the Commissioner's decision.  *See id.*; 20 C.F.R. § 404.900(a)(5).  The matter may also be remanded to the Social Security Administration for further proceedings.  *Id.*

The Commissioner's decision must be affirmed upon review if it is: (1) supported by "substantial evidence" and (2) based on proper legal standards.  *Uklov v. Barnhart*, 420 F.3d 1002, 1004 (9th Cir. 2005).  If the Court, however, determines that the ALJ's findings are based on legal error or are not supported by substantial evidence, the Court may reject the findings and set aside the decision to deny benefits.  *Aukland v. Massanari*, 257 F.3d 1033, 1035 (9th Cir. 2001).  Substantial evidence is more than a scintilla but less than a preponderance.  *Connett v. Barnhart*, 340 F.3d 871, 873 (9th Cir. 2003).  It is "relevant evidence that, considering the entire record, a reasonable person might accept as adequate to support a conclusion."  *Id.*; s*ee also Howard ex rel. Wolff v. Barnhart*, 341 F.3d 1006, 1012 (9th Cir. 2003) (finding substantial evidence in the record despite the ALJ's failure to discuss every piece of evidence).  "Where evidence is susceptible to more than one rational interpretation," the ALJ's conclusion must be upheld.  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).  This includes deferring to the ALJ's credibility determinations and resolutions of evidentiary conflicts.  *See Lewis v. Apfel*, 236 F.3d 503, 509 (9th Cir. 2001).  This is because the ALJ has a "well-settled role as the judge of credibility."  *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993) (quoting *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982)).  Accordingly, the ALJ's assessment of a claimant's credibility and pain severity should be given "great weight."  *Dominguez v. Colvin*, 927 F. Supp. 2d 846, 865 (9th Cir. 2003) (citing *Nyman*

*v. Heckler*, 779 F.2d 528, 531 (9th Cir. 1986)).  Nevertheless, the Court "must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).

## VI.   THE ALJ'S CREDIBILITY DETERMINATION

### a.  Plaintiff's Arguments

Plaintiff argues that the ALJ failed to articulate specific and legitimate reasons for rejecting Plaintiff's credible testimony.  (ECF No. 19-1 at 3.)  Plaintiff characterizes the ALJ's opinion as discounting her credibility based on (1) "noncompliance with medication;" (2) "taking medication when she needs more focus;" (3) "activities of daily living;" and (4) "personal observation at the hearing."[3]  (*Id.* at 5.)

Plaintiff does not dispute that she was noncompliant with her medication, but argues that the ALJ was required to examine the medical conditions and personal factors that bear on whether Plaintiff could remedy her impairment by taking her medication consistently.  (*Id.* at 6, 9.)  With respect to the ALJ's conclusions regarding Plaintiff's use of medication for her ADHD, Plaintiff argues that this cannot be the only basis of the ALJ's credibility determination.  (*Id.* at 7.)  Regarding Plaintiff's activities of daily living, Plaintiff argues that the ALJ failed to take into consideration the various support systems in place to allow Plaintiff to volunteer at a preschool and attend college level courses.  (*Id.* at 9.)  Plaintiff also argues that the ALJ's personal observations were incorrect because he did not give enough weight to the fact that Plaintiff brought a stuffed bunny to an administrative hearing to help alleviate her anxiety.  (*Id.* at 10.)  According to Plaintiff, because the ALJ failed to articulate legally sufficient reasons for rejecting

---

[3] The ALJ based his determination of Plaintiff's credibility on the fact that he found that (1) the medical evidence did not comport with Plaintiff's allegations of her symptoms; (2) Plaintiff was noncompliant with medication; (3) Plaintiff's ADHD medication effectively controlled her symptoms; (4) inconsistencies existed between Plaintiff's alleged limitations and her activities of daily living; and (5) the ALJ's personal observations of her behavior at the hearing.  (AR at 19-20.)  Plaintiff does not include the ALJ's conclusion that the medical evidence did not support Plaintiff's allegations of her symptoms.  However, in the interest of completeness, the Court will address all of the ALJ's reasons in support of his credibility determination, even those which Plaintiff did not include in her motion.

Plaintiff's testimony, the Court should deem her testimony true and award benefits.  (*Id.* at 10-11.)

### b.  Defendant's Arguments

Defendant argues that the ALJ gave legitimate reasons for finding Plaintiff' testimony not fully credible.  (ECF No. 20-1 at 8.)  With respect to Plaintiff's activities of daily living, Defendant argues that the record supports the ALJ's conclusion that Plaintiff "was able to attend college, volunteer at a preschool as an assistant teacher on a regular basis, and maintain social relationships with friends."  (*Id.* at 9.)  Defendant also argues that the ALJ properly concluded that Plaintiff's "symptoms of anxiety, depression and ADHD improved with medication."  (*Id.* at 10.)  Defendant also states that the ALJ's conclusion that Plaintiff failed to comply with her prescribed treatment "is a valid basis for a credibility finding."  (*Id.* (internal citations omitted).)  With respect to the ALJ's personal observations of Plaintiff during the hearing, Defendant notes that the ALJ is the fact finder and can consider his personal observations of a claimant during a hearing in evaluating his or her credibility.  (*Id.* at 11.)  Defendant argues that, although Plaintiff interprets the fact that she brought a bunny to the hearing "as establishing disability, the ALJ, who personally observed Plaintiff's conduct at the hearing, found otherwise, and the Court should defer to the ALJ's interpretation of the evidence."  (*Id.* citing *Burch*, 400 F.3d at 680-81.  Defendant reiterated that the ALJ "presented four valid reasons for finding Plaintiff's allegations of disability not credible."  (ECF No. 20-1 at 11.)  As a result, Defendant argues that if even one of these reasons is upheld by the Court, any error by the ALJ as to the other reasons is harmless error.  (*Id.*)

### c.  Relevant Law

The Ninth Circuit has established a two-step analysis for the ALJ to evaluate the credibility of a claimant's testimony regarding subjective pain and impairments.  *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2008) (citing *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007)).  First, the ALJ must determine whether Plaintiff presented objective medical evidence of an impairment or impairments that could reasonably be

expected to produce the pain or other alleged symptoms.  *Vasquez*, 572 F.3d at 591.

Second, if Plaintiff satisfies the first step and there is no affirmative evidence of malingering, the ALJ may reject a plaintiff's testimony only if he provides "specific, clear and convincing reasons" for doing so.  *Id.*; *see also Parra v. Astrue*, 481 F.3d 742, 750 (9th Cir. 2007) (citing *Lester v.  Chater*, 81 F.3d 821, 834 (9th Cir. 1995)).  These reasons must be "sufficiently specific  to permit the court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony."  *Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1224 n. 3 (9th Cir. 2010) (citation omitted).

In weighing the credibility of a plaintiff's testimony, the ALJ may use "ordinary techniques of credibility determination."  *Id.*  The ALJ may consider the "inconsistencies either in his testimony or between his testimony and his conduct, his daily activities, his work records, and testimony from physicians and third parties concerning the nature, severity and effect of the symptoms of which he complains."  *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).  If the ALJ's credibility finding is supported by substantial evidence in the record, we may not engage in second-guessing.  *See Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) citing *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999).

### d.  Analysis

The ALJ determined that Plaintiff presented objective medical evidence of impairments that could reasonably be expected to produce her alleged symptoms.  (AR at 19.)  Because there was no evidence of malingering, the ALJ could only reject Plaintiff's testimony if he provided "specific, clear and convincing reasons" for doing so.  *Vasquez*, 572 F.3d at 591.

As mentioned above, the ALJ based his determination of Plaintiff's credibility on: (1) the fact that the medical evidence did not comport with Plaintiff's allegations of her symptoms; (2) Plaintiff was noncompliant with taking her medication consistently; (3) Plaintiff's ADHD medication effectively controlled her symptoms; (4) inconsistencies existed between Plaintiff's alleged limitations and her activities of daily living; and (5)

the his personal observations of Plaintiff's behavior at the hearing.  (AR at 19-20.)  Each reason will be analyzed separately, below.

### i. Medical Evidence Does Not Support Plaintiff's Allegations of her Disability

Plaintiff claimed that she could not work due to depression, anxiety and symptoms from her Von Willebrand's disease.  With respect to all of these impairments, the ALJ found that the medical evidence did not comport with Plaintiff's allegations of her symptoms, and thus, the ALJ found her to be less than entirely credible.

When the ALJ finds that medically determinable impairments could reasonably be expected to cause a claimant's alleged symptoms, the ALJ may not reject a claimant's testimony simply because the alleged severity of the pain or symptoms is not supported by objective medical evidence.  *See Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) (finding that an ALJ cannot reject a claimant's testimony simply because it is unsupported by objective medical evidence).  However, when assessing a claimant's credibility, the ALJ may consider inconsistent medical evidence as a factor in his credibility analysis.  *See also Lingenfelter*, 504 F.3d at 1040 (in determining credibility, the ALJ may consider "whether the alleged symptoms are consistent with the medical evidence").

### 1. Von Willebrand's Disease

With respect to Plaintiff's medical condition of Von Willebrand's disease, Plaintiff stated that she still has breakthrough bleeds from birth control which can cause her to have her period for two months at a time, leading to fatigue.  (AR 38.)  Despite Plaintiff's allegations regarding her symptoms, the ALJ noted that the objective medical evidence reveals that her condition was stable.  (AR 19)  The ALJ cited medical records for June 6, 2011 which note that Plaintiff was "doing well from a bleeding disorder standpoint."  (*Id.* at 297.)  The notes further describe that Plaintiff was in college and majoring in art.  (*Id.*)  Her physical activities included walking, she had a gym membership, and her activities of daily living were described as "age appropriate."  (*Id.*)  The ALJ also cited a medical

report from July 23, 2012 which described Plaintiff as "doing well on her current oral

contraceptive pill, Lybril." (*Id.* at 422.)  Plaintiff reported having "no other bleeding

issues." (*Id.*)  The notes also state that Plaintiff "has been doing well this year, interested

in becoming child care specialist." (*Id.*)

The ALJ's references to the record showing that Plaintiff's medical condition of

Von Willebrand's disease was stable is a clear and convincing reason for his

determination that the medical record did not support Plaintiff's allegations of her

symptoms. *Vasquez*, 572 F.3d at 591.  Further, the ALJ cited substantial evidence which

supported the conclusion that Plaintiff's statements regarding the severity of her

symptoms did not comport with the medical evidence showing Plaintiff's medical

condition was stable.

### 2.  Depression and Anxiety

Plaintiff alleged that her depression and anxiety prevents her from being able to

work at least one day during the week.  (AR 43.)  She testified that she was enrolled in

Japanese, but "flunked out . . . because of [her] anxiety and depression." (AR at 44-45.)

However, with respect to Plaintiff's mental disorders, the ALJ noted that Plaintiff

received treatment on a regular and routine basis. (*Id.* at 19.)  According to the ALJ,

although the records showed that Plaintiff occasionally became overwhelmed and

anxious (citing *id.* at 510-547, 548-638), they also showed that when compliant with

medication, Plaintiff "felt better and was better able to respond to situations and handle

her anxiety." (*Id.* at 19.)  Specifically, the ALJ cited a "therapist progress note" from

July 30, 2011 that states "slight improvement now that she decides to be consistent with

meds and healthy diet." (*Id.* at 370.)  The ALJ also cited a physician progress note from

May 23, 2011 which indicated that Plaintiff was "doing really well overall" and "socially

doing well." (*Id.* at 384.)  A treatment note from October 4, 2012 states that Plaintiff was

"taking meds regularly.  Doing a lot better but still feeling depressed." (*Id.* at 536.)  A

treatment note from July 5, 2013 states "Plaintiff reports that she took her medication

consistently this week and is feeling better."  A treatment note from February 12, 2013

states that Plaintiff "reported that she is doing much better with medication consistency. She is taking a shower and washing her face every 3 days and trying to brush her teeth every morning." (*Id.* at 592.) A therapy note from January 21, 2013 stated "she knows that if she took her meds consistently she would probably have an easier time doing the things she needs to do, but depression holds her back from that as well." (*Id.* at 598.)

The ALJ's reliance on these medical records is a clear and convincing reason for finding Plaintiff less than fully credible. *Vasquez*, 572 F.3d at 591. Substantial evidence in the record supports the ALJ's conclusion that Plaintiff's symptoms improved when she was compliant with her medication, which, in turn, undermines Plaintiff's allegations regarding the severity of her symptoms. Notably, the Ninth Circuit has emphasized that, while discussing mental health issues, it is error to reject a claimant's testimony merely because symptoms wax and wane in the course of treatment. "Cycles of improvement and debilitating symptoms are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working." *Garrison v. Colvin*, 759 F.3d 995, 1018 (9th Cir. 2014) citing *Holohan v. Massanari*, 246 F.3d 1195, 1205 (9th Cir. 2001) ("[The treating physician's] statements must be read in context of the overall diagnostic picture he draws. That a person who suffers from severe panic attacks, anxiety, and depression makes some improvement does not mean that the person's impairments no longer seriously affect her ability to function in a workplace.").

Here, however, the medical record shows *consistent* improvement during the time when Plaintiff regularly took her medication. The ALJ did not cherry-pick from the record to draw any conclusions regarding Plaintiff's mental health. It may well be that a different judge, evaluating the same evidence, would have found Plaintiff's allegations regarding her anxiety and depression fully credible. But this Court is not a trier of fact. Credibility determinations are the province of the ALJ. *Russell v. Bowen*, 856 F.2d 81, 83 (9th Cir.1988). Where, as here, the ALJ has made specific findings justifying a

37

decision to disbelieve an allegation of disabling symptoms of depression and anxiety because of evidence in the record that Plaintiff's symptoms improved when she took her medication, and those findings are supported by substantial evidence in the record, our role is not to second-guess that decision.  Accordingly, the ALJ did not err in finding Plaintiff less than entirely credible on the basis that the medical record undermined her allegations of disabling symptoms.

### ii.  Non-Compliance with Medication

Plaintiff argues that the ALJ erred in finding her less than credible because of her lack of compliance in taking her prescription medication, without expressly considering Plaintiff's proffered explanation.  (ECF No. 19-1 at 10.)  Plaintiff states that, according to her testimony, she does not take her medication because she has ADD and forgets to take her medication, "on top of the fact that the medication causes more depression and anxiety; and makes her bleed."  (*Id.* at 9.)  However, a common sense reading of her testimony indicates that she does not take her medication because of her ADD, and as a result of not taking her medication, she has increased depression, anxiety and bleeding.[4]

---

[4] The following is an excerpt from the hearing transcript:

Q: Your records indicated that at some point you got off all your medications for a while?
A: Yes.
Q: Why was that?
A: I also have ADD and I tend to forget my medications and that causes more depression and anxiety and it causes me to have heavy bleeds.

Plaintiff's assertion that she does not take her medication because it causes increased depression and anxiety is belied by the objective medical evidence that shows that when she is compliant with her medication, her anxiety and depression improves.  (AR 514, 518, 551, 568, 570.)  Plaintiff even states in her testimony that when she takes her medication regularly, it controls her anxiety "for the most part." (*Id.* at 39.)

Plaintiff's assertion that her medication causes increased bleeding is also inconsistent with the medical record which shows that Plaintiff's bleeding disorder is under control.  (*See* AR 297, 422.)  Plaintiff points to no objective medical evidence supporting her contention that her medication causes increased anxiety and depression and/or increased bleeding.  The Court likewise could not find any support for this notion.

The Ninth Circuit has held that, in assessing a claimant's credibility, the ALJ may properly rely on "'unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment.'" *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cit. 2008) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996)); *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).  According to agency rules, "the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure." SSR 96–7p.[5]  Moreover, a claimant's failure to assert a good reason for not seeking treatment, "or a finding by the ALJ that the proffered reason is not believable, can cast doubt on the sincerity of the claimant's pain testimony." *Fair*, 885 F.2d at 603.  Therefore, noncompliance with a prescribed course of treatment is clear and convincing reason for finding a plaintiff's subjective complaints lack credibility. *Id.*; *see also Bunnell v. Sullivan*, 947 F.2d 341, 346 (9th Cir. 1991).

In *Molina*, the court found it was permissible for the ALJ to consider an unexplained lack of treatment where the claimant reportedly suffered from an anxiety disorder. *Molina v. Astrue*, 674 F.3d 1104, 1113-113 (9th Cir. 2012).  The court explained that the record was "filled with evidence" that despite the claimant's physician's repeated efforts to persuade the claimant to seek psychiatric treatment, she failed to do so until after she applied for disability benefits. *Id.* "Although Molina provided reasons for resisting treatment, there was no medical evidence that Molina's resistance was attributable to her mental impairment rather than her own personal preference, and it was reasonable for the ALJ to conclude that the 'level or frequency of treatment [was] inconsistent with the level of complaints.'" *Id.*  In contrast, the court in

---

[5] Social Security Rulings (SSRs) "do not carry the 'force of law,' but they are binding on ALJs nonetheless." *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1224 (9th Cir.2009). They "'reflect the official interpretation of the [SSA] and are entitled to some deference as long as they are consistent with the Social Security Act and regulations.'" *Id.* (alteration in original) (quoting *Avenetti v. Barnhart*, 456 F.3d 1122, 1124 (9th Cir. 2006)).

*Pate-Fires v. Astrue*, found that a Plaintiff's failure to comply with a treatment program was the result of her mental illness where the "evidence overwhelmingly demonstrate[d]" as such.  564 F.3d 935, 945 (8th Cir. 2009)

This case is similar to *Molina* in that Plaintiff asserts that her failure to take her medication as prescribed was due to her ADD, but the record does not corroborate Plaintiff's contention in this regard.  Unlike the plaintiff in *Pate-Fires v. Astrue*, here Plaintiff does not point to any medical evidence or medical professional opinion to support her contention that her ADD prevents her from taking her medications as prescribed.  Instead, the record shows that on October 25, 2011, Plaintiff reported that she had been off of her ADD medication for over a year and felt that she focused ok.  (AR 383.)  At the psychological consultative examination on December 11, 2013, it was documented that Plaintiff adequately focused on all testing tasks.  (*Id.* at 645.)  Dr. Lynch noted that Plaintiff could perform simple math calculations in her head; complete testing tasks from start to finish; and exhibited no signs of hyperactive disorder.  (*Id.*)   As such, the ALJ was permitted to consider Plaintiff's unsupported explanation for her failure to follow her mental health treatment regime in making his credibility determination.  *Molina*, 674 F.3d at 1113-14.

### iii.  Medication has been effective at controlling Plaintiff's ADHD Symptoms

Plaintiff argues that, although the ALJ relied on the objective medical evidence to support his conclusion that Plaintiff's ADHD symptoms were controlled with medication, reliance on the objective medical evidence cannot be the only factor upon which the ALJ relies in making a credibility determination.  (ECF No. 19-1 at 7-8.)  First, the Court finds that the ALJ properly relied on the objective medical evidence in determining that Plaintiff lacked credibility.  As stated above, the record shows that on October 25, 2011, Plaintiff reported that she had been off of her ADHD medication for over a year and felt that she focused ok.  (AR 383.)  At that time, she resumed the medication because her classes required increased focus.  (*Id.*)  At the psychological consultative examination on

December 11, 2013, it was documented that Plaintiff adequately focused on all testing tasks.  (*Id.* at 645.)  Dr. Lynch noted that Plaintiff could perform simple math calculations in her head; complete testing tasks from start to finish; and exhibited no signs of hyperactive disorder.  (*Id.*)

The record thus contains substantial evidence supporting the ALJ's conclusion that medication has been relatively effective in controlling plaintiff's ADHD symptoms.  *See Thomas*, 278 F.3d at 954.  Because effective symptom control through medication is a valid reason for rejecting claimant testimony, and there is substantial evidence to support the ALJ's determination, the ALJ had a proper basis to discount plaintiff's testimony regarding her ADHD symptoms.

Second, the ALJ did not rely *only* on the objective medical evidence in making his credibility determination.  As Plaintiff acknowledges in her brief, and as already discussed, the ALJ based his determination of Plaintiff's credibility on the fact that (1) the medical evidence did not comport with Plaintiff's allegations of her symptoms; (2) Plaintiff was noncompliant with medication; (3) Plaintiff's ADHD medication effectively controlled her symptoms; (4) inconsistencies existed between Plaintiff's alleged limitations and her activities of daily living; and (5) the his personal observations of Plaintiff's behavior at the hearing.  (AR19-20.)  Because the ALJ's credibility determination was based on a number of factors, one of which being that the medical evidence supported the conclusion that Plaintiff's ADHD symptoms were effectively controlled with medication, the ALJ did not err.

### iv.  Activities of Daily Living

Plaintiff argues that the ALJ erred when considering her activities of daily living because he "did not rely on either of the permissible methods upon which an ALJ may rely on the performance of activities of daily living" and "merely relied on the performance of the activities themselves, which is not enough."  (ECF No. 19-1 at 9.)  Again, Plaintiff mischaracterizes the ALJ's opinion.  In his opinion, the ALJ states the following:

The medical record, as highlighted above, casts doubt on the credibility of the claimant's allegation.  More specifically, despite the fact that some of her activities of daily living were somewhat limited, some of the physical and mental abilities and social interactions required in order to perform her reported activities are the same as those necessary for obtaining and maintaining employment and are inconsistent with the presence of an incapacitating or debilitating condition.

(AR 20.)

Daily activities may be grounds for discrediting a claimant's testimony when a claimant "is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting." *Fair*, 885 F.2d at 603.  Even when such activities suggest some difficulty functioning, the ALJ may discredit a claimant's testimony to the extent that they contradict claims of a totally debilitating impairment.  *See Turner*, 613 F.3d at 1225; *Valentine v. Comm'r Social Sec. Admin.*, 574 F.3d 685, 693 (9th Cir. 2009).

The ALJ concluded that these activities of daily living, although somewhat limited, required some of the "physical and mental abilities and social interactions" as would be "necessary for obtaining and maintaining employment and are inconsistent with the presence of an incapacitating or debilitating condition." (AR 20.)  The record as a whole supports this conclusion.  The ALJ noted that Plaintiff was able to brush her teeth once per day and shower every other day.  (*Id.* at 16.)  She could make her own meals, take public transportation, and shop using online stores.  (*Id.*)  Therapy records from December of 2012 noted that Plaintiff drove across country to Louisiana to help a friend move, and was to take a plane back home.  (*Id.* citing AR 600.)  More recently in December 2013, Plaintiff reported her daily activities as getting up in the morning, taking care of her own personal hygiene, and taking the bus or the train to Palomar college where she took classes, worked part time and socialized.  (*Id.* at 16 citing AR 646.)

Plaintiff argues that the ALJ failed to take into consideration that Plaintiff is only

15cv1611-DMS-BGS

able to volunteer at the preschool because her father works at the adjoining elementary school and drives her to her volunteer program.  (ECF No. 19-1 at 4.)  The ALJ's determination must be supported by substantial evidence is "evidence that, considering the entire record, a reasonable person might accept as adequate to support a conclusion." *Connett*, 340 F.3d at 873.  While the Court acknowledges Plaintiff's argument that her activities of daily living require certain support systems from her family, "where evidence is susceptible to more than one rational interpretation," the ALJ's conclusion must be upheld.  *Burch*, 400 F.3d at 679.  Here, the ALJ's determination that Plaintiff's ability to volunteer at a preschool program and attend classes at Palomar College evidenced skills transferable to maintaining employment was a reasonable interpretation of the record, even if those activities came with certain support systems from Plaintiff's father or disabled student services.  Indeed, the ALJ acknowledged in his opinion that even though Plaintiff's activities of daily living were "somewhat limited," she nevertheless demonstrated the skills needed to find and maintain employment.  (AR 20.)  An inconsistency between the skills required for her activities of daily living and the extent of her disabling symptoms is a clear and convincing reason for discounting Plaintiff's credibility.  This determination is also supported by substantial evidence in the record.  Therefore, the ALJ did not err in finding that Plaintiff lacked credibility based on inconsistencies between the skills required for her activities of daily living and the extent of her disabling symptoms.

### v.  ALJ's Personal Observations

Plaintiff also argues that the ALJ erred in basing his credibility determination on his personal observations at the hearing.  Specifically, Plaintiff notes that she brought a stuffed bunny to the hearing, and that the ALJ improperly rejected her reasons for doing so.  (ECF No. 19-1 at 10.)  Again, Plaintiff mischaracterizes the ALJ's analysis of the bunny.  The ALJ noted the following with respect to his personal observation of Plaintiff:

> Lastly, the claimant alleged she had difficulty concentrating.  The
> undersigned observed the claimant throughout the hearing.  The claimant did

1   not demonstrate or manifest any difficulty concentrating during the hearing.
2   During the time when the claimant was being questioned, the claimant
3   appeared to process the questions without difficulty and to respond to the
4   questions appropriately and without delay.  The claimant paid attention
5   throughout the hearing.  Moreover, the claimant carried a stuffed bunny to
6   the hearing, which she said helped her to remain calm, but she was not
7   preoccupied with it during the hearing and she did not interact with it as a
8   child would.

9   (AR 20.)  Contrary to Plaintiff's argument, the ALJ did not conclude that Plaintiff
10  was lying about the calming effect of the bunny.  Instead, he noted that she sat with the
11  bunny and was not distracted by it, nor did she behave inappropriately or childlike with
12  the bunny.  (*Id.*)

13      The ALJ properly considered Plaintiff's demeanor during the hearing in rejecting
14  her testimony and subjective complaints.  The ALJ can use personal observations when
15  evaluating credibility.  *See Thomas*, 278 F.3d at 960; Social Security Ruling ("SSR") 96–
16  7P ("[T]he adjudicator is not free to accept or reject the individual's complaints solely on
17  the basis of such personal observations, but should consider any personal observations in
18  the overall evaluation of the credibility of the individual's statements.").  The ALJ noted
19  that Claimant "did not demonstrate or manifest any difficulty concentrating during the
20  hearing."  (AR 20.)  He further noted that Plaintiff "appeared to process the questions
21  without difficulty, and to respond to the questions appropriately and without delay.  The
22  claimant paid attention throughout the hearing."  (*Id.*)  Although an ALJ's personal
23  observations, standing alone, cannot support a determination that a claimant is not
24  credible, they may form part of that determination.  *Fair*, 885 F.2d at 602; *see also*
25  *Morgan*, 169 F.3d at 600 ("The inclusion of the ALJ's personal observations does not
26  render the decision improper." (internal quotation marks omitted)).  *Reinertson v.*
27  *Barnhart*, 127 F. App'x 285, 289-90 (9th Cir. 2005).  The ALJ's credibility finding was
28  based on clear and convincing reasons, supported by substantial evidence in the record.

1  Moreover, this credibility determination was not solely based on the ALJ's personal

2  observations, but was properly part of his overall assessment of the credibility of the

3  Plaintiff's statements.  The ALJ did not err in using his personal observations of Plaintiff

4  as a factor in his credibility determination.

5      **e.  Conclusion**

6      As explained above, the ALJ properly based his determination that Plaintiff lacked

7  credibility on the fact that he found that (1) the medical evidence did not comport with

8  Plaintiff's allegations of her symptoms; (2) Plaintiff was noncompliant with medication;

9  (3) Plaintiff's ADHD medication effectively controlled her symptoms; (4) inconsistencies

10 existed between Plaintiff's alleged limitations and her activities of daily living; and (5)

11 the ALJ's personal observations of her behavior at the hearing.  (AR at 19-20.)  The

12 Court **RECOMMENDS** that Defendant's Motion to Summary Judgment is **GRANTED**

13 as to the issue of credibility.

14 **VII.   ALJ'S CONSIDERATION OF TREATING SOURCE OPINION**

15     **a.  Plaintiff's Argument**

16     Plaintiff argues that the ALJ improperly discounted Dr. Patel's medical opinion

17 from 2012, and failed to consider entirely Dr. Patel's medical opinion from 2013.  (ECF

18 No. 19-1 at 11.)  Regarding Dr. Patel's 2012 opinion, Plaintiff states that the ALJ rejected

19 this opinion because of a lack of objective medical evidence in support of the opinion,

20 and a reliance on subjective findings from Plaintiff and her mother, both of whom the

21 ALJ found to be less than fully credible.  (*Id.* at 15.)  Plaintiff also argues that the ALJ

22 had an obligation to consider Dr. Patel's 2013 opinion, and his failure to do so is

23 reversible error.  (*Id.* at 16.)

24     **b.  Defendant's Argument**

25     Defendant argues that the ALJ's decision to reject Dr. Patel's "check the box

26 assessment" is supported by substantial evidence in the record.  (ECF No. 20-1 at 12.)

27 According to Defendant, Dr. Patel's opinion was not supported by the objective medical

28 evidence.  (*Id.* at 13.)  Defendant also notes that the ALJ questioned the credibility of

1  Plaintiff's mother, who the ALJ concluded to be the main source of information for Dr.

2  Patel's opinion.  (*Id.*)  Defendant does not address Dr. Patel's 2013 opinion or the ALJ's

3  failure to consider it.

4      **c.  Relevant Law**

5      The Ninth Circuit distinguishes among the opinions of three types of physicians:

6  (1) those who treat the claimant ("treating physicians"); (2) those who examine but do not

7  treat the claimant ("examining physicians"); and (3) those who neither examine nor treat

8  the claimant ("nonexamining physicians").  *Lester*, 81 F.3d at 830.  It is undisputed that

9  Dr. Patel is a treating physician.  (ECF No. 19-1 at 11; ECF No. 20-1 at 12.)

10     Social Security Ruling 96-2p mandates that if a treating source's medical opinion

11 is well-supported and not inconsistent with the other substantial evidence in the case

12 record, it must be given controlling weight.  Even if the treating source's opinion is not

13 entitled to controlling weight, it is entitled to deference and must be weighed against all

14 20 C.F.R. 404.1527 factors.  Since opinions of treating doctors are entitled more

15 deference than the opinions of non-treating doctors, an ALJ must provide specific and

16 legitimate reasons, supported by substantial evidence in the record, when the treating

17 doctor's opinion will not be given controlling weight.  *Lester*, 81 F.3d at 830.  Although

18 the treating physician's opinion is entitled to great deference, it is "not necessarily

19 conclusive as to either the physical condition or the ultimate issue of disability."

20 *Morgan*, 169 F.3d at 600.

21     The Ninth Circuit requires that an ALJ provide "clear and convincing" reasons to

22 reject the opinion of a treating physician when that opinion is uncontradicted.  *Lester*, 81

23 F.3d at 830-31.  Where the opinion of the claimant's treating physician is contradicted,

24 and the opinion of a non-treating source is based on independent clinical findings that

25 differ from those of the treating physician, the opinion of the non-treating source may

26 itself be substantial evidence.  *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995).

27 "When there is conflicting medical evidence, the [Commissioner] must determine

28 credibility and resolve the conflict."  *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir.

1992).  In addition, the ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings.  *Id.*

### d. Dr. Patel's 2012 Opinion

The ALJ found that Dr. Patel's 2012 "mental Impairment Questionnaire" from December 13, 2012 "has no probative value because there is no objective evidence from Dr. Patel."  (AR 22.)  The ALJ further noted that, "[e]ven if Dr. Patel had reviewed the treatment notes from Ms. Schmitt and Ms. Kleiner, the treatment notes do not address the subjective findings Dr. Patel documented."  (*Id.*)  Lastly, the ALJ stated that Dr. Patel "apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant's mother and seemed to uncritically accept as true most, if not all, of what she reported.  Yet, as explained elsewhere in this decision, there exists good reasons for questioning the reliability of the mother's subjective complaints."  (*Id.*)  Plaintiff does not challenge the ALJ's credibility determination regarding Plaintiff's mother.

In *Batson v. Comm'r of Soc. Sec. Admin.*, the Ninth Circuit upheld an ALJ's decision discounting the treating physician's view because it was in the form of a checklist, did not have supporting objective evidence, was contradicted by other statements and assessments of Plaintiff's medical condition, and was based on Plaintiff's subjective descriptions of pain.  359 F.3d 1190, 1195 (9th Cir. 2004).  Similarly, Dr. Patel opined in checklist format that Plaintiff was seriously limited in nearly every area of functioning, yet failed to explain how she reached her conclusions and did not include the medical or clinical findings to support her assessment.  (AR 465-66.)  Instead, Dr. Patel provides subjective descriptions of events such as Plaintiff's inability to pass a sewing class due to "mood liability," and her decision to work as a nanny and live in a pantry as her bedroom.  (*Id.* at 465-66.)  Such subjective reports require the credibility of Plaintiff or her mother, both of whom the ALJ found not credible.

Thus, given that an ALJ may discredit a treating physician's opinions that are

conclusory, brief, and unsupported by the record as a whole, it was not legal error for the ALJ to discount Dr. Patel's opinions in this case since they were in the form of a checklist, not supported by objective evidence, and significantly based on Plaintiff's or Plaintiff's mother's reports.  *See also Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001).

### e.  Dr. Patel's 2013 Opinion

After reviewing the consultative examination report by Kenneth Lynch, L.D., Ph.D dated December 11, 2013, Dr. Patel provided an additional opinion in support of Plaintiff's disability application "based on our thirteen year treatment and observation of her." (AR 649.)  In this letter, Dr. Patel writes that "[w]hile [Plaintiff] can often present herself as articulate, intelligent, and capable during a short encounter, thirteen years of medical and psychological history cannot be denied and years of consistent, predictable dysfunction demonstrate that [Plaintiff] is currently incapable of keeping up that 'appearance of ability' for any meaningful, extended period of time." (*Id.*)  Dr. Patel's letter provides a number of examples of Plaintiff's inability to function independently. (*Id.* at 649-50.)

The ALJ makes no mention of Dr. Patel's 2013 letter in his unfavorable disability determination opinion.  Even if the Court interprets the ALJ's failure to address Dr. Patel's 2013 letter as implicitly rejecting it, the ALJ failed to provide the reasons why.  Unlike Dr. Patel's 2012 letter, the 2013 letter is not a "checklist-style form . . . completed as an accommodation to the claimant." (*Id.* at 22.)  Instead, Dr. Patel explains that she wrote the 2013 letter in response to what she felt was an "inaccurate picture" of Plaintiff in Dr. Lynch's report. (*Id.* at 649.)

To reject a treating physician's opinion which is contradicted by another physician, an ALJ must provide specific and legitimate reasons supported by substantial evidence in the record.  *Lester*, 81 F.3d at 830 (internal quotations omitted); *Turner*, 613 F.3d at 1222.  If the treating physician's opinion is not contradicted by another physician, the ALJ must provide clear and convincing reasons.  *Lester*, 81 F.3d at 830.  But the ALJ

here provided neither specific and legitimate nor clear and convincing reasons for his apparent rejection of Dr. Patel's 2013 opinion.  He provided no reasons.  *See also Davenport v. Colvin*, 2015 WL 7769684, at *3 (E.D. Cal. Dec. 3, 2015).  The Court RECOMMENDS a finding that the ALJ's failure to discuss Dr. Patel's 2013 opinion is legal error.

Even though the Court recommends a finding that the ALJ erred in this regard, the harmless error rule applies where substantial evidence otherwise supports the ALJ's decision.  *Curry v. Sullivan*, 925 F.2d 1127, 1131 (9th Cir. 1990).  An ALJ's mistake may be considered harmless if it was "nonprejudicial to the claimant or irrelevant to the . . . ultimate disability conclusion."  *Stout v. Comm'r of Soc. Sec.*, 454 F.3d 1050, 1055 (9th Cir. 2006).

Similar to Dr. Patel's 2012 opinion, the 2013 letter was brief, conclusory and unsupported by objective medical evidence.  *See Thomas*, 278 F.3d at 957 ("The ALJ need not accept the opinion of any physician, even a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings.").  Indeed, the 2013 letter included many of the same subjective statements regarding Plaintiff's abilities that the ALJ properly discounted based on clear and convincing reasons.  (*See e.g.*, section VII(d), above.)  The following are examples of the similarities between the two opinions:

1) Dr. Patel's 2012 questionnaire noted that Plaintiff's "mother assists [Plaintiff] with all things academic."  (AR 466.)  In his 2013 letter, Dr. Patel similarly states that Plaintiff "functions in classes at college only when her mother reads the texts to her and helps with homework, and often her mother must his in class to facilitate appropriate behavior."  (*Id.* at 649.)

2) Dr. Patel states in his 2012 questionnaire that Plaintiff's "mother oversees all basic standards of neatness and cleanliness."  (*Id.* at 466.)  This is similar to Dr. Patel's 2013 letter which states, "personal hygiene and chores such as cleaning [Plaintiff's] room or doing her laundry are only accomplished with the help and guidance of her parents as a 'group' activity.  Unsupervised, [Plaintiff] will not leave her room to

49

perform personal hygiene and activities of daily living[,]" (*Id.* at 649).

3) Dr. Patel's 2012 questionnaire states that "[Plaintiff] requires assistance when going to unfamiliar places due to anxiety, getting lost etc." (*Id.* at 466.)   His 2013 letter similarly states that "[Plaintiff's] 'able' classification regarding her 'ability to travel to unfamiliar places' disregards the numerous times she must call her parents to find her when she takes the wrong bus or train and becomes lost.  [Plaintiff] no longer attends her Department of Rehabilitation meetings because she once got off at the wrong station and is now afraid to try that particular route again." (*Id.* at 650.)

Because Dr. Patel's 2013 letter contained much of the same conclusory and unsupported information already considered, and validly rejected by the ALJ in analyzing Dr. Patel's 2012 questionnaire, the Court **RECOMMENDS** a finding that any error in failing to discuss the 2013 letter was harmless.  *See Stout*, 454 F.3d at 1055 (an ALJ's error is harmless where such error is inconsequential to the ultimate non-disability determination); *Curry*, 925 F.2d at 1131 (harmless error rule applies to review of administrative decisions regarding disability).

### f.  Conclusion

The Court **RECOMMENDS** a finding that, although the ALJ erred by failing to specifically consider Dr. Patel's 2013 letter, any such error was harmless.

## VIII.   CONCLUSION

Having reviewed the matter, the undersigned Magistrate Judge recommends that Plaintiff's motion for summary judgment be **DENIED** and that Commissioner's cross-motion for summary judgment be **GRANTED**.  This Report and Recommendation of the undersigned Magistrate Judge is submitted to the United States District Judge assigned to this case, pursuant to 28 U.S.C. § 636(b)(1).

**IT IS ORDERED** that no later than **July 8, 2016**, any party to this action may file written objections with the Court and serve a copy to all parties. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with

the Court and served on all parties no later than **July 22, 2016**.

Dated:  June 24, 2016

Hon. Bernard G. Skomal
United States Magistrate Judge

15cv1611-DMS-BGS